UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In Re:

SRQ TAXI MANAGEMENT, LLC

      Debtor,

8:17-bk-7782-CED
8:18-ap-13-CED

_____/

TRAZIUS AVRISSAINT, et al.,

      Appellants,

v.

CASE NO. 8:23-cv-1729-SDM

SARASOTA MANATEE AIRPORT
AUTHORITY,

      Appellee/Cross-Appellant.

_____/

**<u>ORDER</u>**

      In the underlying adversary proceeding, SRQ Taxi Management, LLC, and

twenty-two taxi drivers[1] (the drivers) sued the Sarasota Manatee Airport Authority

(the airport) for breach of contract. The parties agreed to bifurcate the trial. After

the liability phase, the bankruptcy judge determined[2] that the airport breached the

_____

[1] Trazius Avrissaint, Gerald Chery, Eddy Charles, Clive Lloyd Buckley, Billy Nelson, Verdieu Germinal, Louis Bellevue, Alix Monde, Oricene Flaurestil, David Lyle, Abel Jeune, Mitch Fils, Roosevelt Edwards, Chris Pickney, Askin Basar, Rodrick Denton, Helene LaRoche, Marcellars Miller, Gary Rimsa, James Phillips, Fred Dluthwaite, and Ronyl Marcelus.

[2] Judge Williamson entered his findings of fact and conclusions of law after the liability phase of trial. Judge Williamson's findings (Doc. 18-5) were adopted and incorporated into the final judgment (Doc. 18-7).

concession agreement, that the airport breached the implied duty of good faith and fair dealing, and that the drivers lack standing to enforce the concession agreement. (Doc. 8-255). However, SRQ failed to prove damages,[3] and the bankruptcy judge entered final judgment in favor of the airport, against SRQ, and against the drivers. (Doc. 8-518) The drivers appeal (Doc. 1) the bankruptcy judge's conclusion that the drivers are not intended third-party beneficiaries to the concession agreement. The airport cross-appeals (Doc. 7) the bankruptcy judge's conclusion that the airport breached the concession agreement and breached the implied duty of good faith and fair dealing.

## BACKGROUND

Since 1982, Diplomat Taxi[4] and the airport have entered several concession agreements that grant Diplomat the right to operate a taxi service at Sarasota-Bradenton International Airport. (Doc. 8-255 at 3) In 2009, the airport and Diplomat entered the most recent concession agreement. The concession agreement contains an initial term of five years and includes at the airport's option an additional five-year renewal. The agreement grants Diplomat (referred to under the agreement as the "concessionaire") the right to operate a metered taxicab and non-metered limousine service at the airport:

---

[3] Because the FFCL concludes that the drivers lack standing, the drivers did not participate in the damages phase of trial.

[4] Diplomat Taxi is an original contracting party to the concession agreement. In May 2016, Diplomat assigned its rights and obligations under the concession agreement to SRQ. (Doc. 17 at 8) SRQ is the only party in this action. However, because the Drivers argument depends on the intent of the contracting parties, this order refers to both Diplomat and SRQ.

- 2 -

> Concessionaire shall have the non-exclusive right to conduct a combination metered taxicab and non-metered limousine operation for the purpose of transporting airline passengers and baggage from the Terminal and will furnish and operate at all times sufficient and suitable taxicabs and limousines to maintain adequate service required by Airport patrons.

(Doc. 18-1 at 6, §4.1)[5]

   In exchange for this right, Diplomat agrees to pay six cents per de-planing passenger (CA § 2.1), agrees to adequately meet all reasonable demands for taxicab or limousine service at the airport (CA §5.2), and agrees to comply with the airport's ground transportation rules (CA, Ex. C, §1).  The ground transportation rules, which apply to each commercial vehicle operating at the airport, require Diplomat to provide high-quality taxicabs in excellent condition; to include Diplomat's logo or company name on the outside of each taxicab; to maintain adequate automobile liability insurance that names the airport as an additional insured; and to ensure that each driver is clean, neat, and courteous to passengers.  (CA, Ex. C, §3.1)

   Although the concession agreement grants Diplomat the right to provide taxicab and limousine services, the agreement permits other "operators"[6] to conduct ground transportation services at the airport.  (CA §4.3)  The airport specifically reserves the right to allow hotel, motel, and rental-car vehicles to transport passengers from the airport.  (CA §4.3(A))  Also, the airport reserves the right to allow licensed

---

   [5] For the remainder of this order, each citation to the Concession Agreement (CA) cites directly to the agreement. Because the Ground Rules are attached as an exhibit to the CA, each citation to the Ground Rules is cited as CA, Ex. C, §.

   [6] The Ground Rules define "operator" as "any company or person engaged in any type of ground transportation service."  (Doc. CA, Ex. C at C2).

taxicabs and limousines to transport passengers with advanced reservations.  (CA §4.3(B))  But the ground rules restrict the operation of other ground transportation operators at the airport.  For example, under the ground rules, a ground transportation operator may only pick up passengers in a designated "commercial vehicle queuing area," a three-lane driveway west of the baggage claim area.  (CA, Ex. C, §3.3.3)  Within the commercial vehicle queuing area, only Diplomat may pick up passengers in Lane 1 (the inside lane), other commercial vehicles (other than buses) must use Lane 2, and buses must use Lane 3.  (CA, Ex. C, §3.3.5)  The ground rules further provide that "[p]ickups by Operators other than [Diplomat] may be made on a prearranged basis only."  (CA, Ex. C, §3.3.3)  For almost thirty-five years, Diplomat was the only taxi company with the right to provide on-demand, for-hire ground transportation at the Airport.  But that changed in 2015.

In early 2015, Uber and other "transportation network companies" (TNCs), a federal regulation term, began operating at the airport.  (Doc. 8-255 at 9)  In violation of airport policy, the TNC drivers operated without a written agreement and without a permit from the airport.[7]  (Doc. 8-255 at 9)  Initially, the airport resisted the TNCs' operating at the airport.  (Doc. 8-255 at 9)  However, because the TNC drivers proved deceptive and difficult to stop, and because passengers demanded

─────────────────────

[7] Under the ground rules, no ground transportation operator can operate at the Airport without a written agreement or permit from the airport.  (CA, Ex. C, §3.3.2 ("[a]ll commercial vehicles desiring to pick up passengers must obtain a Ground Transportation Permit and display the Authority approved permits sticker in the lower left corner of the front windshield for access to the commercial queuing area . . . ."))

- 4 -

access to the TNCs' services, the airport stopped resisting and began to regulate the TNCs.  (Doc. 8-255 at 9)

In July 2015, the airport agreed to Uber drivers' operating at the airport through the end of 2015.  (Doc. 8-255 at 10)  And in December 2015, the airport agreed to Uber drivers' operating at the airport for an additional year.  (Doc. 8-255 at 10)  Three aspects of the December 2015 agreement are significant.  The newer agreement required Uber to install a geofence — a virtual geographic boundary that triggers a response when a mobile device enters or leaves a particular area — to track Uber drivers at the airport.  (Doc. 8-255 at 10)  The geofence contains a "first in, first out" (FIFO) zone.  Each Uber driver that enters the FIFO zone is placed in a queue based in time of entry.  (Doc. 8-255 at 10)  When a passenger hails an Uber through the app, the passenger is matched with the first driver in the queue.  (Doc. 8-255 at 10)  When a passenger accepts a match, Uber or a third-party receives notice that a pick-up has occurred.  (Doc. 8-255 at 11)  Under the December 2015 agreement, Uber agreed to pay the airport $2.50 for each pick up.  (Doc. 8-255 at 11)  Contrary to the ground rules, which require that a commercial driver (except Diplomat's drivers) use Lane 2 of the commercial vehicle queuing area, the December 2015 agreement permits Uber drivers to pick up passengers in a short-term parking area directly in front of the airport's main terminal.  (Doc. 8-255 at 11)

Soon after the December 2015 agreement between the airport and Uber, Diplomat assigned the concession agreement to SRQ Taxi.  (Doc. 8-255 at 11)  In May 2016, SRQ's president, Cullen Meathe, complained that the airport was

- 5 -

"accommodating" Uber. (Doc. 8-255 at 11) In response, the airport's president, Rick Piccolo, denied that the airport accommodates Uber, and stated:

> The airport has designated an area in the public parking lot for Uber drivers to utilize per our agreement. It does not reserve any particular spaces but simply provides a designated general area where their customers can be instructed to find them.

(Doc. 8-255 at 11) Less than six months later, however, the airport provided the TNCs six reserved parking spaces in the short-term parking area, increased the time that the TNC drivers can park for free, and added signs (inside and outside the airport terminal) that direct passengers to the reserved parking spaces. (Doc. 8-255 at 12)

Today, a passenger arriving at the airport can hail an Uber just as easily as an SRQ taxi. Once a de-planing passenger walks through the terminal and rides the escalator to ground level, instead of turning right toward the taxi starter, the passenger sees a sign (with Uber and Lyft logos) that directs the passenger to the TNC loading area, which is about 150 steps away. (Doc. 8-255 at 13) If, along the way, a passenger hails an Uber through the app or if a passenger hails an Uber after arriving at the six reserved parking spaces, the passenger will have an Uber driver in moments. (Doc. 8-255 at 13)

The airport not only accommodates TNCs, the airport gives TNCs the "red carpet treatment." (Doc. 8-255 at 13) Through these accommodations, the airport ushered many passengers to TNCs (and away from SRQ Taxi), increased the airport's ground transportation revenue, and devastated SRQ's

business.  In the six months before the airport installed signs and reserved parking spaces for the TNCs parking, SRQ received about 75% of about 5,800 pick ups.  (Doc. 8-255 at 13)  Although the number of passengers that needed ground transportation remained relatively constant, six months after the airport installed signs and reserved parking spaces for the TNCs, the TNCs increased their share of pick-ups from about 27% to about 62%, and SRQ's share of pick ups dropped from about 75% to less than 30%.  (Doc. 8-255 at 14)

The airport's "red carpet treatment" toward the TNCs further injured SRQ's business over time.  In March 2019, about 10,000 arriving passengers needed a ride — almost twice as many as in 2016.  (Doc.8-255 at 14)  Of those passengers, almost 90% used TNCs while slightly more than 10% used an SRQ taxi.  (Doc. 8-255 at 14)  Although nearly twice as many passengers used ground transportation in March 2019 as in March 2016, SRQ received about half the number of pick-ups  (Doc. 8-255 at 14)  Notwithstanding SRQ's decrease in pick-ups, and regardless of whether passengers used SRQ's services, the concession agreement required SRQ to pay six cents per passenger.  (Doc. 8-255 at 14)  And because the airport receives $2.50 per pick-up from Uber, the airport generated more than $25,000 in additional revenue.  (Doc. 8-255 at 14)

SRQ and the drivers sued the airport for breach of contract.  After the trial on liability, Judge Williamson determined (1) that the concession agreement grants SRQ Taxi an exclusive right to operate an on-demand, for hire

taxi service at the airport; (2) that the airport breached the concession agreement by allowing the TNCs to provide on-demand, for-hire ground transportation at the airport; (3) that the airport's "red carpet treatment" of TNCs destroyed SRQ's reasonable contractual expectations and breached the airport's implied duty of good faith and fair dealing; and (4) that the airport is liable only to SRQ Taxi because the drivers lack standing to enforce the concession agreement. (Doc. 8-255 at 15–37)

Before the trial on damages, the airport moved to exclude SRQ's expert witness, Joseph Chernow. (Doc. 11 at 6) Judge Williamson denied the motion without prejudice. (Doc. 11 at 6) During the damages trial, the airport again moved to exclude Chernow, and Judge Williamson took the *Daubert* motion under advisement. (Doc. 11 at 7) After SRQ's case-in-chief, the airport argued that Chernow's testimony is inadmissible and moved for judgment on partial findings under Rule 52(c), Federal Rules of Civil Procedure. (Doc. 11 at 7) Judge Williamson took the Rule 52(c) motion under advisement. (Doc. 11 at 7).

Judge Williamson died before ruling on the damages, and the adversary proceeding was assigned to Chief Judge Delano. After certifying under Rule 63, Federal Rules of Civil Procedure, that she was familiar with the record and that "the case [could] be completed without prejudice to the parties," Judge Delano granted the airport's *Daubert* motion (Doc 18-6 at 3), granted the

airport's Rule 52(c) motion (Doc. 18-6 at 3), and entered final judgment in fa-

vor of airport, against SRQ Taxi, and against the drivers  (Doc. 18-7 at 3).

## DISCUSSION

The bankruptcy court's determination of standing is reviewed *de novo*.  *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir. 2005).  The drivers must demonstrate that that they have suffered an injury-in-fact.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  No party disputes that the drivers are not a party to the concession agreement. To establish injury-in-fact, the drivers must first demonstrate that the airport invaded a "legally protected interest." *AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1360 (11th Cir. 2007) (quoting *Lujan*, 504 U.S. at 560–61).  Whether a non-party to a contract has a legally enforceable right is governed by state law.  *AT&T Mobility, LLC*, 494 F.3d at 1360 (11th Cir. 2007).

Under Florida law, "a party is an intended beneficiary only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party or a class of persons to which that party claims to belong." *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.*, 647 So. 2d 1028, 1031 (Fla. 4th DCA 1994) (citations omitted).  The contracting parties' intent "is determined by the terms of the contract as a whole, construed in the light of the circumstances under which [the contract] was made and the apparent purpose that the parties are trying to accomplish." *A.R. Moyer, Inc. v. Graham*, 285 So.2d 397, 402 (Fla.1973).

### I. The concession agreement expresses no clear intent to primarily and directly benefit the drivers.

The drivers argue that because the "drivers are essential to the business of SRQ[,]" the "[c]oncession [a]greement expressly acknowledged the presence of the [d]rivers in the transactions and their inherent role in carrying out the purpose of the [c]oncession [a]greement . . . ." (Doc. 17 at 17)  Specifically, the drivers contend that seven different provisions[8] of the concession agreement "create rights and duties for the [d]rivers." (Doc. 17 at 17 and 18)  However, a review of these provisions fails to reveal an express intent to primarily and directly benefit the drivers.  Only two of those provisions mention the drivers.  (CA §§ 5.7, 5.8)  One of those provisions requires Diplomat to merely provide drivers' logs on request.  (CA §5.7)  The other provision — the only provision that expressly mentions the drivers — governs Diplomat employees generally, not just taxi-drivers.  (CA § 5.10)  And that provision — Article 5.10 — requires Diplomat to ensure that each driver is at least eighteen years old; that each driver holds a valid driver's license; that each driver is legally authorized to work in the United States; that each driver speaks English; and that each driver remain within ten feet of his taxicab or limousine.  None of these provisions expresses a clear intent to primarily and directly benefit the drivers.

Notwithstanding that these provisions "may not expressly use the word '[d]rivers,'" the drivers argue that the concession agreement "is meaningless unless the requirements apply to those driving and operating taxicabs."  (Doc. 21 at 4)  For

---

[8] CA §§ 5.2, 5.4, 5.5, 5.7, 5.8, 5.10, 6.0.

example, Section 5.7 requires Diplomat to deliver drivers' logs to the airport.  According to the drivers, Diplomat's duty to deliver implies that the drivers have a duty to maintain the drivers' logs.  (Doc. 21 at 6)  But besides imposing a separate requirement on drivers to maintain drivers' logs, Diplomat could comply with Section 5.7 without involving the drivers.  For example, Diplomat could either (1) install an automated system that tracks the trips of each taxi and limo driver or (2) assign a non-driver employee to track the logs after each trip.  And in any event, an implied and incidental obligation fails to clearly express an intent to primarily and directly benefit the drivers.

Next, the drivers argue that a "reading of the [c]oncession [a]greement indicates that it was the intent of [the airport] to move a passenger from point A to point B and to use the [d]rivers to perform that personal service."  (Doc. 21 at 6)  And because the airport knew that taxi-drivers would charge money for each ride, the drivers argue that the airport intended to benefit the drivers.  (Doc. 21 at 7)  In response, the airport argues that the concession agreement is "for the benefit and convenience of the traveling public" and argues that "a general intent to benefit patrons is not enough to confer upon third party employees/independent contractors third-party beneficiary status."  (Doc. 20 at 17) (quoting CA at 1; Doc. 17-2 at 4)

*Holland v. Levy Premium Foodservice Ltd. P'ship*, 469 F.App'x 794 (11th Cir. 2012), supports the airport's argument.  In *Holland*, the defendants had an exclusive contract to provide concessions and food service in luxury suites.  The defendants imposed a 20% service charge on all food and beverages.  Each menu notifies suite

patrons of the service charge and is accompanied by a document entitled "Service

Charge/Tipping Policy" (the policy), which states:

> The service charge, which is on your bill, is shared in the form of higher
> wages for all Suite employees. It helps our company attract a high qual-
> ity employee from the set up crew to the clean up crew and everyone in
> between. All these employees are critical to making your experience
> memorable.

*Holland*, 469 F.App'x at 795–796.  Alleging that the defendants withheld this service

charge, several of the defendants' employees sued as third-party beneficiaries for

breach of contract.  Specifically, the employees argued that the defendants intended

to benefit the employees because the policy stated that the service charge "is shared

in the form of higher wages for all [s]uite employees."

Applying Georgia law,[9] *Holland* holds that, even if a contract existed between

the defendants and the patrons, the employee-plaintiffs lacked standing because the

policy's stated intent is to benefit the patrons, not the employees.  469 F.App'x at

797.  *Holland*'s reasoning is persuasive.  Although the policy permits the defendants

to "attract a high quality employee" with higher wages, the benefit of higher wages is

incidental to the stated purpose of "making [the patrons'] experience memorable."

*Holland*, 469 F.App'x at 797.  Similarly, although the concession agreement envi-

sions that taxi-drivers (whether employees or independent contractors) will earn

some wage for their service, the stated purpose of the concession agreement is "for

---

[9] Although Florida law applies in this action, *Holland*'s reasoning is persuasive because Geor-
gia's standard for intended third-party beneficiaries is almost identical.  *See Haldi v. Piedmont Nephrol-
ogy Assocs.*, 238 Ga.App. 321, 641 S.E.2d 298, 300 (2007) (holding that a third party only has stand-
ing to maintain a breach-of-contract action if it "clearly appear[s] from the contract that it was in-
tended for [the third party's] benefit.")

the benefit and convenience of the traveling public." (Doc. 17-2 at 4; CA at 1)  Accordingly, the concession agreement fails to clearly express an intent to primarily and directly benefit the drivers.

## II. The contracting parties did not clearly intend to primarily and directly benefit the drivers.

Even if the concession agreement fails to clearly express an intent to primarily and directly benefit the drivers, the contracting parties' pre-contract and post-contract actions can show an intent to directly benefit a third-party.  *See Goodell v. K.T. Enterprises, Ltd.*, So.2d 1087 (Fla. DCA 1981).  The drivers cite *Florida Power & Light Co. v. Mid-Valley, Inc.*, 763 F.2d 1316, 1321 (11th Cir. 1985), and argue that the contracting parties knew that the "[d]rivers would be doing all the work." (Doc. 17 at 19)

In *Florida Power & Light Co.*, Mid-Valley, Inc., a wholly owned subsidiary of Brown & Root, Inc., contracted with Florida Power and Light Company (FPL).  Under the contract, Mid-Valley agreed to provide engineering services on a water-cooling reservoir and an associated embankment.  After Mid-Valley performed under the contract, the embankment collapsed, and the reservoir failed.  FPL sued Mid-Valley and Brown & Root.  Although not a contracting party, Brown & Root as an intended third-party beneficiary claimed the benefit of an exculpatory and indemnity provision.

The Eleventh Circuit determined that Brown & Root is an intended third-party beneficiary of the FPL-Mid Valley contract because both parties "intended the bulk of the actual work to be done by the employees of Brown & Root and knew that

- 13 -

[the work] was being done by those employees." *Florida Power & Light Co.*, 763 F.2d at 1321. The undisputed record shows that Brown & Root met with FPL to discuss designing the reservoir; that Mid-Valley lacked the means of performing the engineering and design work; that FPL relied on the knowledge and experience of Brown & Root employees; and that Brown & Root's employees performed the design work. *Florida Power & Light Co.*, 763 F.2d at 1321. FPL contracted with Mid-Valley because Brown & Root is not unionized and maintains an "open shop" policy. *Florida Power & Light Co.*, 763 F.2d at 1321. Fearful that contracting directly with Brown & Root would cause labor strife, FPL contracted with Mid-Valley. But "all concerned knew, understood, and accepted that the transaction was between FPL and Brown & Root." *Florida Power & Light Co.*, 763 F.2d at 1321.

The drivers argue that *Florida Power & Light Co.* is analogous to this case because, before entering the concession agreement, the airport knew that the drivers were independent contractors and knew that the drivers "would be doing all the work." (Doc. 17 at 19) Rather than contract with each driver, the drivers argue that the airport contracted with Diplomat as the "conduit" or "broker" for the drivers. (Doc. 17 at 19) To support this argument, the drivers cite the deposition testimony of Diplomat's former President, Jorge Resendiz. From 1982 through 2009, Resendiz negotiated on Diplomat's behalf several concession agreements with the airport. (Doc. 17 at 8) Resendiz testified that in his view the concession agreement benefited "the drivers, the customers, the airport, and [Diplomat]." The drivers also cite

- 14 -

several independent contractor agreements between SRQ and each driver.[10] (Docs. 8-190–191)  In each agreement, SRQ declares an intent to share with the drivers each of the privileges that SRQ "has secured[] for picking up passengers at the Sarasota Bradenton International Airport."  (Doc. 8-190 at 1)  Based on this evidence, the drivers apparently argue that, like the FPL-Mid-Valley contract in *Florida Power & Light Co.*, the airport entered the concession agreement to "work-around" contracting with each individual driver.

Unlike *Florida Power & Light Co.*, however, nothing in the record suggests that the airport contracted with Diplomat to "work-around" contracting with each individual driver.  The drivers assume that contracting with each individual driver was the airport's only alternative to entering the concession agreement, but the airport accepted several competing bids from other taxi companies.  (Doc. 101 at 20 and 21) And unlike in *Florida Power & Light Co*, the drivers were not involved in any of the pre-contract discussions with the airport, the drivers possess no unique experience or expertise, and there is no evidence that Diplomat lacked the means to perform under the concession agreement.[11]  At most, the independent contractor agreements are

---

[10] The drivers filed two independent contractor agreements in the record. For the liability phase of the trial, the drivers and the airport stipulated (Doc. 8-249 at 10) that each of the twenty-two drivers identified in the third amended complaint are independent contractors of SRQ (and in some instances, Diplomat), and the drivers assert that the two agreements are "exemplars of the other 22 agreements in all respects material to this appeal." (Doc. 17 at 18, n. 4)

[11] Of course, Diplomat needs taxicab and limousine drivers to perform under the concession agreement. But contracting with several independent contractor drivers is not essential to performance because, as concessionaire, Diplomat (and SRQ) could perform by hiring independent contractors, employees, or any other licensed drivers.

evidence that Diplomat intended to benefit the drivers.[12]  But the drivers must show that both the airport and Diplomat clearly intended to benefit the drivers.[13]  *Caretta Trucking*, 647 So. 2d at 1031.  ("It is insufficient to show that only one party unilaterally intended to benefit a third party.")  Resendiz's testimony fails to show that the airport intended to primarily and directly benefit the drivers.  Despite Resendiz's personal view that the concession agreement 'benefited the drivers, the customers, the airport and [Diplomat]," Resendiz testified that nobody directly said that the concession agreement would benefit the drivers.  (Doc. 101 at 63)  Accordingly, the parties' pre-contract and post-contract actions fail to clearly express that both Diplomat and the airport intended to directly and primarily benefit the drivers.

## CONCLUSION

Because neither the contracting parties nor the concession agreement clearly express an intent to primarily and directly benefit the drivers, the drivers lack standing.  And because the airport's cross-appeal depends on a reversal in favor of the drivers, a review of the bankruptcy court's conclusion that the airport breached the

---

[12] The two independent contractor agreements on the record are between a driver and SRQ, Diplomat's successor-in-interest, and these agreements were made several years after the 2009 concession agreement. Because Florida law requires that the contracting parties intended to "benefit the third party at the time the promisor and promisee entered the contract*," Int'l Erectors, Inc. v. Wilhoit Steel Erectors & Rental Serv.*, 400 F.2d 465, 472 (5th Cir. 1968), these agreements alone fail to establish that Diplomat clearly intended to directly and primarily benefit the drivers.

[13] Even if the drivers are intended third-party beneficiaries of the concession agreement (which they are not), the drivers apparently assigned to SRQ their claims against the airport: "[The driver] hereby irrevocably assigns, quitclaims, and transfers to [SRQ] any and all of [the driver's] rights, claims, causes of action . . . which in any way arise from or relate to the operations of Transportation Network Companies . . . whether the claims are against the Sarasota Manatee Airport Authority, the TNCs or any other third party . . . ."  (Doc. 8-190 at 1)  Because neither the bankruptcy judge nor the parties mention this provision (perhaps for a good reason), this order does not rely on this provision.

concession agreement is unnecessary.  For the reasons stated above, the judgment is

**AFFIRMED**.  The clerk must enter judgment for Sarasota Manatee Airport Author-

ity, and the clerk must close the case.

ORDERED in Tampa, Florida, on March 11, 2025.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

- 17 -